[Cite as *State v. Brentlinger*, 2017-Ohio-2588.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

v.

JOHN D. BRENTLINGER, II,

    DEFENDANT-APPELLANT.

CASE NO. 1-16-23

O P I N I O N

Appeal from Allen County Common Pleas Court
Trial Court No. CR20150274

**Judgment Affirmed**

Date of Decision:  May 1, 2017

APPEARANCES:

    *Samuel H. Shamansky* for Appellant

    *Eva J. Yarger* for Appellee

**WILLAMOWSKI, J.**

{¶1} Defendant-appellant John D. Brentlinger II ("Brentlinger") appeals the judgment of the Allen County Court of Common Pleas, claiming (1) his conviction was made in the absence of sufficient evidence, (2) his conviction was against the manifest weight of the evidence, (3) the trial court improperly admitted prejudicial hearsay, and (4) the trial court wrongly determined that Allen County was a proper venue for trying all of the counts charged against him. For the reasons set forth below, the judgment of the lower court is affirmed.

*Facts and Procedural History*

{¶2} On July 16, 2015, Brentlinger was indicted on one count of theft in violation of R.C. 2913.02(A)(1), R.C. 2913.02(B)(2); one count of felonious assault in violation of R.C. 2903.11(A)(2), 2903.11(D)(1)(a); one count of kidnapping in violation of R.C. 2905.01(A)(3), 2905.01(C)(1); one count of kidnapping in violation in of R.C. 2905.01(A)(2), 2905.01(C)(1); one count of aggravated robbery in violation of R.C. 2911.01(A)(1), 2911.01(C); one count of tampering with evidence in violation of R.C. 2921.12(A)(1), 2921.12(B); and one count of extortion in violation of 2905.11(A)(1), 2905.11(B). Doc. 1. The acts forming the basis of this indictment were alleged to have occurred between the dates of January 5, 2015, and January 15, 2015. *Id*. The trial on these charges occurred between the dates of March 1 and March 4, 2016.

{¶3} At trial, Joseph Croft ("Croft"), the alleged victim in this case, testified that he had a business relationship with Brentlinger that soured and ended sometime in 2011 or 2012. Tr. 141. Since that time, Brentlinger has asserted that Croft owed him $50,000, but Croft has disputed this claim. Tr. 149. On the night of January 5, 2015, Croft left Elite Truck and Auto, which is the business where he worked, to go to an auction. Tr. 142. After Croft attended the auction, he returned to Elite Truck and Auto and discovered that a snow plow that had been in the parking lot was now missing. Tr. 143. Croft went inside and reviewed the security tapes from that evening. Tr. 144-145. On the tape, Croft saw Brentlinger drive up, get out of his truck, and take the plow. *Id.* Ex. 1. Croft testified that he had not given Brentlinger permission to take the plow. Tr. 147.

{¶4} Croft testified that he then called Brentlinger and told him that he would notify the police if Brentlinger did not return the snowplow. Tr. 148. Croft testified that Brentlinger responded to this demand by saying, "I am the f'ing law." *Id.* After he reported Brentlinger to the police, Croft began searching for the snow plow and drove to the old Gomer bank building, which is a place where Brentlinger occasionally stayed. Tr. 151. When he arrived at that location, Croft remained in his vehicle and saw Brentlinger outside of the building, but Croft did not see the snow plow. Tr. 152. Ex. 17. Roughly thirty minutes after Croft arrived, Brentlinger got into his vehicle and began driving away. Tr. 152. Croft,

hoping to find the snow plow, followed Brentlinger onto U.S. Route 30. *Id.* Croft trailed Brentlinger into a rest area, parking his vehicle at a distance where he could still see Brentlinger's truck. Tr. 159. At trial, Croft testified that he remained in his vehicle after Brentlinger walked out of view and occupied himself on his phone, looking up periodically to see if Brentlinger's vehicle was still in the parking lot. Tr. 159.

{¶5} After five to seven minutes, Croft said he caught something out of the corner of his eye. *Id.* He turned to look and saw Brentlinger standing outside the passenger side of Croft's vehicle with a gun pointed at Croft through the window. *Id.* Brentlinger then told Croft to unlock the vehicle door. *Id.* After Croft refused, Brentlinger walked around the front of the vehicle with the gun pointed at Croft the entire time and approached the front, driver's side door. Tr. 159-160. Brentlinger attempted to open the door, which was still locked. Tr. 160. He then placed his gun against the window and said, "Unlock the f'ing door." *Id.* When Croft refused, Brentlinger fired his gun into the air, which prompted Croft to unlock the door. *Id.* As soon as the door was unlocked, Brentlinger pulled the door open, grabbed Croft, dragged him out of the vehicle, and struck him on the head with the gun. *Id.* At this time, the keys were in the ignition and the vehicle was running. Tr. 163. Once Croft was out of his vehicle, Brentlinger hit him again and smacked his face, saying, "Do you think this is a game? I want my f'ing

money." Tr. 160. Brentlinger then said, "Take off your clothes. I know you're wired. I know you're working for the cops." Tr. 161.

**{¶6}** Croft testified that Brentlinger, at this point, ordered him to walk to the back of the truck. Tr. 162-163. Croft refused, and Brentlinger, with the gun two feet away from Croft's head, fired another shot into the air. *Id.* Croft tried to get to his phone to dial 9-1-1, but Brentlinger took Croft's phone and shot it two times on the ground. Tr. 162. Brentlinger again told Croft to take his clothes off, and Croft again refused to follow these instructions. *Id.* Brentlinger then fired another shot into the air and said, "The next one is going in you," "I suggest you start walking." Tr. 163. After firing yet another shot into the air, Brentlinger pushed Croft, and Croft began walking backwards away from Brentlinger. *Id.*

**{¶7}** When Croft had taken roughly ten steps, Brentlinger walked three or four steps backwards, got inside Croft's vehicle, and drove across the parking lot to his vehicle. *Id.* Upon reaching his vehicle, Brentlinger got out, grabbed something from his truck, and got back into Croft's vehicle. Tr. 164. Croft testified that another person was in Brentlinger's truck. *Id.* This other person allegedly drove Brentlinger's truck away while Brentlinger drove Croft's vehicle to a place just outside of the rest area where he parked it. *Id.* Croft testified that his vehicle was recovered later that night after Croft reported this incident to the

police. Tr. 164-165. Croft said that his keys were missing, and his vehicle had to be towed to his workplace. Tr. 166, 168.

{¶8} Over the next few days, Croft cooperated with the police to record several phone conversations between himself and Brentlinger. Tr. 169. The prosecution introduced the recorded conversations between Croft and Brentlinger, which were facilitated by Detective Mark A. Baker ("Detective Baker"). Tr. 294-295. In one of these conversations, Brentlinger stated,

> **What happened the other night, my friend, was an act of God that you didn't wind up dead on the side of the highway. Okay? That was God saving your life from me killing you. Okay? The first thing you need to do is get on your knees and thank Jesus because you're still alive. That was him that saved your life not me * * *.**

Ex. 16. In another conversation, Brentlinger said, "If you didn't follow me, it wouldn't have happened * * *. You need to be thankful you're alive." Ex. 17. When Croft brought up the subject of his phone, Brentlinger said, "Your media card is in front of a f*****g snow plow somewhere in Cleveland." *Id.*

{¶9} Brentlinger also testified at trial. He claimed that he had a meeting with Croft at a restaurant on January 3, 2016. Tr. 429, 431. At this meeting, Brentlinger raised the issue of the money that Croft allegedly owed him. Tr. 432. In response, Brentlinger claimed that Croft gave him permission to take a snow plow from the parking lot of Elite Truck and Auto, saying,

> **Look, off the record strictly * * * the plow is sitting out back of the shop. If you have a truck with wasp wiring and a mount, go get it * * * I'm not going to bless the fact that I told you to go get it. I'm not going to say that I told you to go get it. I'm not going to record it. I'll get it replaced with a new one and down the road I go.**

Tr. 433. Tr. 428. On January 5, 2016, Brentlinger went to the parking lot of Elite Truck and Auto and took the snow plow while Croft was away. Tr. 135, 436. Brentlinger said that he then dropped off the snowplow and drove to where he had been staying at the old Gomer bank building. Tr. 438-439. He left Gomer, Ohio to go to Kirtland, Ohio, getting on U.S. Route 30. Tr. 440.

{¶10} As he drove, Brentlinger noticed that someone seemed to be following him. Tr. 154, 444. He sped up, but the vehicle continued to trail him. Tr. 445. Brentlinger decided to pull into a rest area, located on U.S. Route 30 in Allen County, to see if the person behind him would follow him. *Id*. Brentlinger stated that he was unaware of the identity of the person who was following him at the time he pulled off into the rest area and claimed that no one else was with him inside his truck that night. Tr. 447. After he parked, Brentlinger got out of his truck to investigate this situation. *Id*. He walked "behind the rest area, through the woods and out in the cornfield." Tr. 448. He then hid behind a pole fifty to sixty feet away from Croft's vehicle and looked to see who was inside the vehicle. *Id*. From this distance, he was able to identify the driver as Croft. *Id*.

{¶11} Brentlinger admitted that he then walked up to Croft's vehicle with his gun fully visible to Croft and said, "Roll the window down." Tr. 448, 458, 469. He then asked Croft, "Do you have a gun on you? What are you doing? What's your problem?" Tr. 448. Croft replied, "No, I don't have a gun on me. I just want to talk to you." *Id.* Brentlinger then said, "Well, why don't you step out of the vehicle, to the back of the vehicle, and we'll talk." *Id.* Brentlinger testified that he met Croft at the back of Croft's vehicle where they began to argue over the money Brentlinger claims Croft owed him. Tr. 449-450. Brentlinger denied that he shot Croft's phone but did admit that he discharged his gun that night. Tr. 451, 458. According to Brentlinger, Croft took a swing at him while they were at the back of Croft's vehicle and "caught" Brentlinger's nose, causing Brentlinger to discharge his firearm into the ground. Tr. 451. Later at trial, Brentlinger characterized this as a "warning shot" fired "behind [his] back." Tr. 483. In response to this blow, Brentlinger testified that he said to Croft, "Now we're done. Okay. You start walking. I'm leaving. Otherwise, I'm going to shoot you. You've threatened me. I'm done. Game over." *Id.* Brentlinger then testified that he locked Croft out of his vehicle and then left the rest area, driving to Medina where he stayed the night. Tr. 452.

{¶12} On January 6, 2015, Brentlinger received a call from Detective Baker, who was assigned to investigate Croft's complaint. Detective Baker called

Brentlinger to inform him that Croft had filed a report of the incident that had occurred on January 5, 2015. Tr. 280. Ex. 14. During this conversation, which was recorded, Detective Baker asked Brentlinger what had happened on the night of January 5, 2015. In response, Brentlinger said that "[Croft] was advised that following me was a bad idea." Ex. 14. Brentlinger also denied that he fired a gun and claimed that he did not hit Croft with his gun. Ex. 14. When Detective Baker stated that Croft had a lump on his head, Brentlinger insisted that no physical altercation occurred between him and Croft. *Id.* When asked at trial whether the recorded conversation was a "fair and accurate" representation, Brentlinger said, "It was recorded. We listened to it yesterday. Partially. It depends on your fair and accurate." Tr. 454.

{¶13} Following his conversation with Detective Baker, Brentlinger spent most of the day of January 6, 2015, stranded at Kirtland College because he "punctured a tire" on their campus and ended up spending "ten hours trying to get [his] tire fixed." *Id.* The next day—January 7, 2015—Brentlinger testified that he continued his journey through Ohio. As he was driving through Mansfield, Ohio, which is in Richland County, he testified that he "had * * * an epiphany. I thought 'why not send one of these pistols back to the house'?" Tr. 455, 459. Consequently, Brentlinger disassembled one of his guns and shipped the parts in two different packages from Mansfield, Ohio to his home in Tennessee. Tr. 455,

215. Brentlinger testified that he sent all of the parts of the gun except for the barrel and the slide receiver. Tr. 455. When asked why he shipped the gun from Mansfield to his home in Tennessee, Brentlinger testified that "it [was] a diversion." Tr. 455.

{¶14} At trial, Shanda Pearson ("Pearson")—a postal worker in Tennessee who delivers mail to Brentlinger's house—testified that, on January 7, 2015, she was contacted by Brentlinger's wife, Lynette Brentlinger ("Lynette"), regarding this package. Tr. 210-211, 213-214. In her testimony, Pearson stated that Lynette asked her to intercept a package that was on its way to the Brentlingers' house. Tr. 212. Pearson explained to Lynette that she could not seize a package without a reason. Tr. 213. Pearson asked, "Why do you not want this package delivered to your house? She told me that --." *Id.* At this moment, the defense counsel objected on grounds of hearsay. The prosecution argued that this statement was "not to prove the truth of the matter asserted" and was "just to show what [Pearson] did and what course of action she took from there." Tr. 213. The trial court overruled the objection of the defense, issuing an instruction to the jury that this statement is "not being offered for the truth of the matter asserted * * *. You can't take the statement of what was said in the statement, but that it just explains why [Pearson] did what she's doing." *Id.* Pearson then testified that Lynette said,

> **John [Brentlinger] * * * was mailing a gun back to their house that he had used in a crime in Ohio, that he had assaulted a man**

**with it and shot at the man, shot the phone the man had with the gun, and that he had thought at the time the cops had the shell casings and so he was mailing the gun back to her to hide and she did not want any part of it. She did not want the gun delivered to her house because she was scared for her and her children.**

Tr. 214. Pearson then notified the postal inspectors regarding what Lynette had reported. Tr. 214. In response to this report, postal inspector, David Wilson, obtained a search warrant, opened the two packages, and found the disassembled handgun. Tr. 227-228. Wilson testified at trial that the barrel of the gun was not in either package. Tr. 229.

{¶15} A gun barrel that matched this weapon was later discovered by police in a storage locker that was owned by Brentlinger and located in Kentucky. Tr. 246, 249. In his testimony, forensic expert Kevin Kramer ("Kramer") said that he assembled the gun that Brentlinger had mailed using the barrel that was found in Kentucky. Kramer then tested the firearm and examined the three shell casings that Detective Baker had recovered at the rest area on U.S. Route 30 on April 1, 2015. Tr. 291, 371-373. Based on his testing, Kramer was able to conclude that all three shell casings were cycled through the firearm that Brentlinger shipped to his house. Tr. 371-372. Kramer testified that he was further able to determine conclusively that at least one of the shell casings had been fired through the barrel that police recovered in Brentlinger's storage locker. *Id.* During cross examination, however, Brentlinger had claimed that the gun he shipped to his

home in Tennessee was not the weapon that he fired on the night of January 5, 2015, though he also admitted that the three shell casings found at the rest area had been cycled through the weapon he mailed. Tr. 469, 493, 495. He further admitted that he did not have any evidence that would suggest that the breach imprints on the shell casings were not made by the firearm that he sent to Tennessee. Tr. 458-459.

{¶16} During closing arguments, the defense asserted that the State failed to prove venue for the charge of tampering with evidence because the prosecution only proved that the alleged criminal conduct occurred in Richland County, Ohio, not Allen County, Ohio. Tr. 546. The prosecution objected on the grounds that the defense was making an argument that was "contrary to law." Tr. 547. In response, defense counsel contended that Brentlinger must be acquitted unless the State can prove that the defendant committed the acts forming the basis of this charge in Allen County, Ohio. Tr. 586. After hearing the arguments from the defense and prosecution, the trial judge said, "I think it's a factual determination. The jury should decide the case." Tr. 599. Accordingly, the trial judge included the following in the jury instructions:

> **The State must prove beyond a reasonable doubt with respect to each count either that all or any part of the elements of the offense was committed in Allen County, Ohio; or, that all or any part of the offenses involved in the defendant's course of conduct occurred in Allen County, Ohio. In order for you to find that a course of conduct existed, you must find beyond a reasonable**

**doubt that: the offenses involved the same victim; the offenses were committed as part of the same chain of events in furtherance of the same purpose or objective; the offenses involved the same or a similar scheme or plan; or, the offenses were committed along the defendant's line of travel in this state, regardless of his point of origin or destination * * *.**

Tr. 609. On the count of tampering with evidence, the jury "[found] that the State DID prove beyond a reasonable doubt that Allen is the correct county in which the trial should be held." Tr. 644.

{¶17} The jury returned a verdict of not guilty for the charged theft of the snowplow but found Brentlinger guilty of all of the remaining charges. Doc. 236 at 4. At the sentencing hearing, the trial judge found that the count of kidnapping in violation of R.C. 2905.01(A)(3) merged with the count of kidnapping in violation of R.C. 2905.01(A)(2).[1] *Id.* at 12. The prosecution elected to proceed with the count of kidnapping in violation of R.C. 2905.01(A)(3). *Id.* at 13. The trial judge then found that the count of felonious assault in violation of R.C. 2903.11(A)(2) merged with the count of kidnapping in violation of R.C. 2905.01(A)(3). *Id.* at 18. At this juncture, the prosecution elected to proceed with the count of kidnapping in violation of 2905.01(A)(3). *Id.* Brentlinger was then sentenced by the trial court on April 19, 2016. Doc. 236. He filed a notice of appeal on May 11, 2016. Doc. 2.

---

[1] Kidnapping under R.C. 2905.01(A)(2) requires the restraint or the removal of the victim to be committed for the purpose of "facilitate[ing] the commission of any felony or flight thereafter." Kidnapping under R.C. 2905.01(A)(3) requires the restraint or the removal of the victim to be committed for the purpose of "[terrorizing] or [inflicting] serious physical harm."

{¶18} On appeal, Brentlinger raises four assignments of error.

### First Assignment of Error

**Appellant was convicted of kidnapping in the absence of evidence sufficient to support a finding of guilty in violation of his right to due process as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution.**

### Second Assignment of Error

**Appellant's conviction for kidnapping was against the manifest weight of the evidence in violation of his right to due process as guaranteed by the Ohio Constitution.**

### Third Assignment of Error

**The introduction of unfairly prejudicial hearsay statements during appellant's trial violated his rights to confrontation and due process as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and was contrary to the Ohio Rules of Evidence.**

### Fourth Assignment of Error

**Appellant's conviction for tampering with evidence must be overturned because the state failed to prove venue.**

These assignments of error will be considered in this order.

*First Assignment of Error*

{¶19} In his first assignment of error, Brentlinger essentially advances two different arguments against his kidnapping conviction. The first argument questions whether Brentlinger's conviction for kidnapping was supported by

sufficient evidence. Alternatively, Brentlinger proposes a second argument, which assumes arguendo that the facts presented by the State are true. In this argument, he claims that he should not have a separate conviction for kidnapping as this offense was only committed as part of the underlying crimes of felonious assault and aggravated robbery. This argument will require us to examine whether the offenses of kidnapping and aggravated robbery are allied offenses of similar import that are subject to merger. Brentlinger requests that his conviction for kidnapping be overturned on either of these grounds.[2] We, however, find these arguments to be unpersuasive.

### Sufficiency of the Evidence Argument

{¶20} In the first argument advanced under this assignment of error, Brentlinger argues that his conviction was not supported by sufficient evidence. Specifically, he asserts that the State did not provide evidence to prove that Brentlinger removed or restrained Croft within the meaning of R.C. 2905.01(A)(3). The primary issue in this analysis is whether the State produced evidence at trial that supports each of the essential elements of kidnapping.

### Standard of Review

{¶21} "A challenge to the sufficiency of the evidence supporting a conviction requires a court to determine whether the state has met its burden of

---

[2] In appellant's brief, Brentlinger "requests that his convictions for Kidnapping in Counts Three and Four be vacated and the matter reversed for resentencing." Appellant's Brief, 15-16. However, Brentlinger was only convicted of one count of kidnapping in violation of R.C. 2905.01(A)(3). Doc. 207.

-15-

production at trial." *In re Swift*, 8th Dist. Cuyahoga No. 79610, 2002 WL 451226, 3 (March 21, 2002), citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). Consequently, an appellate court is not to examine whether the evidence presented should be believed but should rather "examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Johnston*, 3d Dist. Logan No. 8-13-10, 2014-Ohio-353, ¶ 10, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds in State v. Smith*, 80 Ohio St.3d 89, 684 N.E.2d 668 (1997). The sufficiency of the evidence analysis addresses the question of whether adequate evidence was produced for the case to be considered by the trier of fact and, thus, whether the evidence was "legally sufficient to support the verdict * * *." *State v. Worthington*, 3d Dist. Hardin No. 6-15-04, 2016-Ohio-530, ¶ 12, citing *State v. Lang*, 129 Ohio St.3d 512, 2011–Ohio–4215, 954 N.E.2d 596, ¶ 219; S*tate v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997).

**{¶22}** Sufficiency of the evidence is a question of law and a "test of adequacy rather than credibility or weight of the evidence." *State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19, citing *Thompkins*, *supra*, at 386. The standard for sufficiency of the evidence

**is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt.**

*State v. Plott*, 3d Dist. Seneca Nos. 13-15-39 and 13-15-40, 2017-Ohio-38, ¶ 62, citing *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 47. In this case, Brentlinger was convicted of kidnapping in violation of R.C. 2905.01(A)(3). Thus, the State had to demonstrate that Brentlinger (1) "by force, threat, or deception" (2) "remove[d] another from the place where the other person is found or restrain[ed] the liberty of the other person" (3) with the purpose "to terrorize, or to inflict serious physical harm on the victim or another." R.C. 2905.01(A)(3).[3]

## Legal Analysis

**{¶23}** On examination of the record, we find that the State produced evidence at trial sufficient to establish the essential elements of kidnapping. Regarding the first element, Croft testified on direct examination that Brentlinger stealthily approached Croft's vehicle, pointed a gun at him through the window,

---

[3] Brentlinger was charged with two counts of kidnapping. The first count of kidnapping alleged a violation of R.C. 2905.01(A)(3), which required the prosecution to prove that the defendant restrained or removed the victim for the purpose of "[terrorizing] or [inflicting] serious physical harm." R.C. 2905(A)(3). The second count of kidnapping alleged a violation of R.C. 2905.01(A)(2), which required the prosecution to prove that the defendant restrained or removed the victim for the purpose of "[facilitating] the commission of any felony or flight thereafter." R.C. 2905.01(A)(2). However, at sentencing, the trial court determined that these two counts of kidnapping merged, and the prosecution elected to proceed with a conviction on the count of kidnapping in violation of R.C. 2905.01(A)(3). Doc. 207. Consequently, even though the appellant's brief alleges that neither count of kidnapping was supported by sufficient evidence, our analysis needs only to examine whether the elements of R.C. 2905.01(A)(3) are supported by sufficient evidence since that is the only count of kidnapping for which Brentlinger was convicted and sentenced. *Id*.

and ordered him to get out of the vehicle. Tr. 159. Croft then said that Brentlinger fired the gun into the air when Croft refused to leave the vehicle, prompting Croft to unlock the door. Tr. 160. For the second element, Croft further testified that, after he unlocked his door, Brentlinger "drug [him] out of the vehicle." Tr. 160. At trial, he also said that Brentlinger ordered him at gunpoint to "take off [his] clothes." Tr. 161. When he refused this order, Croft said Brentlinger fired his weapon into the air while the gun was "basically beside [Croft's] head." Brentlinger then told Croft, "The next one is going in you" and "I suggest you start walking." Tr. 163. Croft said that he then walked backwards for about ten steps while Brentlinger had a gun pointed at him. Tr. 160, 163. Concerning the third element, after he unlocked the vehicle door at gunpoint, Croft said that Brentlinger hit him with the gun, "ripped his shirt," struck him multiple times, and pushed him. Tr. 160-161, 163. In his testimony, Croft described six instances in which Brentlinger fired his gun. Tr. 160-163. Four of these shots were fired into the air in close proximity to Croft. Tr. 160, 161, 162-163, 163. Two of these shots were fired at Croft's phone on the ground. Tr. 161. Croft said he was "very" scared and "frightened" during this time. Tr. 160, 163.

{¶24} Since we do not, on review, consider the weight or credibility of the evidence for a sufficiency analysis, Croft's "testimony, if believed by the jury, provided [an adequate] basis for concluding that [Brentlinger] was guilty as

charged." *State v. Brown*, 1st Dist. Hamilton No. C-960715, 1998 WL 32593 (Jan. 30, 1998). In viewing all of the evidence in a light most favorable to the prosecution, each of the essential elements of kidnapping in violation of R.C. 2905.01(A)(3) is supported. Thus, we find that Brentlinger's conviction for kidnapping was supported by sufficient evidence.

### Allied Offenses Argument

{¶25} In his second argument under this assignment of error, Brentlinger asserts arguendo that, if the State's version of events is correct, the offense of kidnapping was incidental to the underlying offenses of felonious assault and aggravated robbery.[4] The primary issue here is whether the crime of kidnapping for which he was convicted[5] was committed only as a part of committing the crime of aggravated robbery, in which case Brentlinger cannot be convicted of both crimes. If, on the other hand, the crime of kidnapping for which he was convicted[6] had a separate animus from the offense of aggravated robbery, Brentlinger can be convicted of both offenses. In support of his argument, Brentlinger points to a statement of the trial judge at the sentencing hearing, which reads, "I'm going to

---

[4] Prior to sentencing, the trial court determined that the two counts of kidnapping merged, and the State elected to proceed with a conviction under the R.C. 2905.01(A)(3) count of kidnapping. The trial court then determined that the R.C. 2905.01(A)(3) kidnapping count and the felonious assault count were incidental and merged. Doc. 236 at 13. At this point, the State elected to proceed with a conviction under the R.C. 2905.01(A)(3) count of kidnapping. Thus, our analysis will focus on whether the crime of kidnapping for which Brentlinger was convicted under R.C. 2905.01(A)(3) was incidental to the crime of aggravated robbery, as Brentlinger was convicted of both of these crimes.

[5] He was convicted of the third count charged in the indictment, which was kidnapping in violation of R.C. 2905.01(A)(3).

[6] See footnote five.

-19-

find that the restraint of the victim was merely incidental to the separate underlying felonious assault." Doc. 236 at 13. Brentlinger argues that this statement is inconsistent with the trial court's decision to deny Brentlinger's motion to be acquitted of kidnapping.

## Standard of Review

**{¶26}** "Both R.C. 2941.25 and the Double Jeopardy Clause prohibit multiple convictions for the same conduct." *State v. Sergent*, 148 Ohio St.3d 94, 2016-Ohio-2696, 69 N.E.3d 627, ¶ 28, quoting *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, 922 N.E.2d 923, ¶ 27. R.C. 2941.25 reads:

> **(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.**
>
> **(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.**

R.C. 2941.25(A), (B).

**{¶27}** Under Ohio law, if a defendant is charged with allied offenses— which are multiple crimes committed with the same conduct—the "trial court is required to merge [these offenses] at sentencing." *Sergent* at ¶ 28, quoting *Underwood* at ¶ 27. To determine "whether two offenses are…subject to merger

under R.C. 2941.25, the conduct of the accused must be considered." *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 16, quoting *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, syllabus. *See State v. Earley*, 145 Ohio St.3d 281, 2015-Ohio-4615, 49 N.E.3d 266. Under R.C. 2941.15(B), multiple convictions are permitted for offenses of a similar kind

> **if we answer affirmatively to just one of the following three questions: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separate? And (3) Were they committed with a separate animus or motivation?[7]**

*State v. Potts,* 3d Dist. Crawford No. 3-10-12, 2011-Ohio-1461*,* ¶ 96, quoting *State v. Bailey*, 1st Dist. Hamilton No. C-104129, 2015-Ohio-2997, ¶76, citing *Ruff* at paragraph three of the syllabus.

{¶28} If the offenses are committed with the same conduct but with a separate animus, multiple convictions can be sustained. *State v. Hadding*, 3d Dist. Auglaize No. 2-12-14, 2013-Ohio-643, ¶ 14. "The Supreme Court of Ohio has defined animus as "purpose, or more properly, immediate motive." *Id.* quoting *State v. Logan*, 60 Ohio St.2d 126, 131, 397 N.E.2d 1345 (1979). Further, "two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Ruff* at ¶ 26.

---

[7] Since an affirmative answer to any one of the three questions in this test is conclusive and we find that the facts of this case clearly demonstrate that the offense of kidnapping was committed with a separate animus from the offense of aggravated robbery, we will limit our analysis to determining whether these offenses had separate motivations, and we will not analyze the facts of this case under the other two prongs.

When addressing the issue of allied offenses, "the question is not whether a particular sentence is justified, but whether the defendant may be sentenced upon all the offenses." *Sergent* at ¶ 28, quoting *Underwood* at ¶ 27. "Whether offenses are allied offenses of similar import is a question of law that this court reviews de novo." *Potts* at ¶ 93, citing *State v. Stall*, 3d Dist. Crawford No. 3-10-12, 2011-Ohio-5733, ¶ 15.

## Legal Analysis

{¶29} Here, we find that the crimes of kidnapping under R.C. 2905.01(A)(3) and aggravated robbery, in this case, are not allied offenses subject to merger. *See State v. Martin*, 11th Dist. Lake No. 2012-L-043, 2013-Ohio-1944, ¶ 36. In this case, the commission of aggravated robbery required the commission of a kidnapping. *State v. Jenkins*, 15 Ohio St.3d 164, 198, 473 N.E.2d 264 (1984), fn. 29. However, in this case, the reverse is not true as the kidnapping did not require the robbery. When he spoke to Detective Baker on the phone regarding his actions on the night of January 5, 2015, Brentlinger indicated what his purpose was in approaching Croft. Brentlinger said, "[Croft] was advised that following me was a bad idea." Ex. 14. After trial, Brentlinger was convicted for kidnapping under R.C. 2905.01(A)(3), which requires the defendant to have the purpose "[t]o terrorize, or to inflict serious physical harm on the victim or another." R.C. 2905.01(A)(3). In finding him guilty of this offense, the jury determined that

Brentlinger had the purpose to terrorize or inflict physical harm at the time that he initially removed Croft from his vehicle and restrained him at gunpoint.

{¶30} Brentlinger's subsequent actions confirm that this was the intention behind his restraint of Croft at gunpoint and his removal of Croft from the vehicle. After pulling Croft out of the vehicle, Brentlinger physically harmed Croft by striking him with a handgun, tearing his shirt, and shoving him. In so doing, Brentlinger committed felonious assault. However, the trial court found that the offenses of kidnapping under R.C. 2905.01(A)(3), for the purpose of "[terrorizing] or [inflicting] serious physical harm" and felonious assault were committed with the same animus as the kidnapping under R.C. 2905.01(A)(3) was committed for the purpose of facilitating the felonious assault and terrorizing Croft. Doc. 236 at 13. Further, the trial court found that the kidnapping offense under R.C. 2905.01(A)(3) did not result in a separate, identifiable harm to Croft as the commission of these crimes were incidental to each other. *Id.* Consequently, the trial court merged the offense of felonious assault into the offense of kidnapping under R.C. 2905.01(A)(3) after the prosecution elected to convict for the offense of kidnapping under R.C. 2905.01(A)(3).

{¶31} In contrast, the offense of aggravated robbery in this case does not appear to have been related to Brentlinger's motive for kidnapping Croft. Based on his actions and statements, Brentlinger appears to have committed the offense

of aggravated robbery with a different "immediate motive" than the one that moved him to commit the offenses of kidnapping and felonious assault. None of the actions or words that accompanied Croft's kidnapping indicate that this crime was committed for the purpose of robbing Croft of his phone. Rather, the aggravated robbery only occurred after Brentlinger saw that Croft was attempting to use his cell phone to call for help. At this point, the focus of Brentlinger's actions in committing aggravated robbery was not simply to terrorize Croft or inflict physical injury. With the aggravated robbery offense, Brentlinger undertook actions calculated to destroy Croft's property and deprive him of the means to call for help. Brentlinger then removed the damaged phone from the rest area and appears to have disposed of it later. Ex. 16.

{¶32} We do not see any indication in the record that Brentlinger removed Croft from his vehicle and restrained him for the purpose of robbing Croft of his cell phone. Rather, the facts of this case show that Brentlinger decided to commit the offense of kidnapping under R.C. 2905.01(A)(3) and then chose to commit the subsequent, separate offense of aggravated robbery. Contrary to the appellant's argument, the offense of kidnapping under R.C. 2905.01(A)(3) was not incidental to or committed for the purpose of furthering the aggravated robbery. Here, the offense of aggravated robbery was committed in addition to the offense of kidnapping under R.C. 2905.01(A)(3). The R.C. 2905.01(A)(3) kidnapping

offense had independent significance before the intention to commit aggravated robbery appears to have been formed in Brentlinger's mind. Thus, the animus that prompted Brentlinger to commit the offense of aggravated robbery was different from the animus that motivated him to commit the earlier offenses of felonious assault and R.C. 2905.01(A)(3) kidnapping.

{¶33} At points in his argument under the first assignment of error, Brentlinger seems to conflate the issues of sufficiency of the evidence and merger of allied offenses. R.C. 2941.25(A) allows a defendant to be charged with allied offenses of similar import but allows only one conviction for such offenses. If the prosecution proves all of the elements of each allied offense at trial, the merger of these allied offenses prior to sentencing does not negate the fact that the State proved the elements of each individual offense. Here, the prosecution provided the necessary evidence for both counts of kidnapping, for felonious assault, and for aggravated robbery. The fact that the counts of kidnapping merged with each other and then merged with the felonious assault charge does not imply that the State failed to provide evidence for the essential elements of kidnapping.

{¶34} When the trial judge said, "I'm going to find that the restraint of the victim was merely incidental to the separate underlying Felonious Assault [charge]," he was stating that the two offenses merged for the purposes of sentencing. Doc. 236 at 13. The trial judge was not, as the appellant's brief

-25-

implies, stating that the kidnapping was not proven in addition to the felonious assault charge. Rather, the court was assuming that both charges were proven but that only one conviction could be entered for these two allied offenses. Since the prosecution elected, in accordance with Ohio law, to proceed with the R.C. 2905.01(A)(3) kidnapping charge at the sentencing hearing, the trial court did not act inconsistently with its statements and did not err in denying the defendant's motion to acquit Brentlinger of all kidnapping charges. *See State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, ¶ 24 (holding that "[w]hen the state elects which of the two allied offenses to seek sentencing for, the court must accept the state's choice and merge the crimes into a single conviction for sentencing * * *."). For these reasons, Brentlinger's first assignment of error is overruled.

*Second Assignment of Error*

{¶35} In his second assignment of error, Brentlinger contends that his conviction for kidnapping was against the manifest weight of the evidence. For this analysis, we consider the weight and credibility of the evidence. The primary issue is whether the evidence, once examined according to its weight and credibility, moves the scale manifestly against a verdict of guilty. Here, Brentlinger argues that the evidence, when weighed properly, shows that "the

elements of 'restraint' and 'removal' were not proven beyond a reasonable doubt." Appellant's Brief, 17. We disagree.

Standard of Review

**{¶36}** When "deciding whether a conviction is against the manifest weight of the evidence, an appellate court determines whether the state has appropriately carried its burden of persuasion." *State v. Blanton*, 121 Ohio App.3d 162, 169, 699 N.E.2d 136 (3d Dist.1997). "Unlike our review of the sufficiency of the evidence, an appellate court's function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict." *Plott, supra*, at ¶ 73. In the manifest weight analysis, "the appellate court sits as a 'thirteenth juror' * * *." *Thompkins, supra*, at 387. On appeal, courts

> **must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387, 678 N.E.2d 541.**

*Plott*, *supra*, at ¶ 73. "A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses." *State v. Coleman*, 3d Dist. Allen No. 1-13-53, 2014-Ohio-5320, ¶ 7. "Only in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's

judgment." *State v. Haller*, 3d Dist. Allen No. 1–11–34, 2012–Ohio–5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011–Ohio–6524, 960 N.E. 2d 955, ¶ 119.

Legal Analysis

{¶37} Previously, in reviewing this record to determine whether the verdict was supported by sufficient evidence, we found that Croft's testimony, if believed, supplied some evidence for each of the elements of kidnapping. Under the manifest weight analysis, we reincorporate Croft's above testimony here and add the fact that the defense referenced evidence of Croft's criminal record—which includes two convictions for receiving stolen property, one conviction for trafficking in drugs, one conviction for theft, and two convictions for having a weapon under disability—to the facts from Croft's testimony already considered. Tr. 174, 177. We also consider all the other testimony from the trial, including Brentlinger's statements.

{¶38} At trial, Brentlinger's testimony conflicted with Croft's at points. While Brentlinger did admit that he clandestinely approached Croft's vehicle and that his handgun was clearly visible when he asked Croft to get out of the vehicle, Brentlinger testified that he did not "order" Croft out of the vehicle. Tr. 469. Rather, after he asked Croft to get out of the vehicle at gunpoint, Brentlinger claims that they each walked around Croft's vehicle and met behind the vehicle.

Tr. 451. At this point, Brentlinger said Croft "[took] a swipe at [him]" that "[caught him] across the nose." *Id.* This caused Brentlinger to fire "[o]ne shot * * *," "behind [him], into the ground." *Id.* At this moment, Brentlinger said that he told Croft, "Now, we're done. Okay. You start walking. I'm leaving. Otherwise, I'm going to shoot you. You've threatened me. I'm done. Game over." *Id.* Brentlinger claimed that he never shot Croft's phone. However, in a recorded call with Croft, he did imply that he took Croft's phone, saying that Croft's media card was "in front of an f'ing snow plow somewhere in Cleveland." Ex. 16. Brentlinger also admitted that he locked Croft out of his vehicle before Brentlinger left the rest area. Tr. 452.

{¶39} At trial, the defense referenced the fact that Brentlinger does not have any prior criminal record. Tr. 180. In turn, the prosecution demonstrated that Brentlinger had made some inconsistent statements regarding the events of January 5, 2015. In the recorded call between Brentlinger and Detective Baker on January 6, 2015, Brentlinger denied firing his gun, hitting Croft with his weapon, and the existence of a physical altercation between himself and Croft. Ex. 14. On cross examination, however, Brentlinger admitted he had fired his handgun and had an altercation with Croft. Tr. 458, 483. The State also referenced a police report that mentioned Croft had a "contusion to the top left side of his skull." Tr. 484. This report also stated that Croft had a torn shirt and scratches on his neck.

Tr. 485. Further, Detective Baker stated, in the recorded call with Brentlinger, that Croft had a bump on his head at the time Croft reported this incident to the police. Ex. 14.

{¶40} The State presented evidence that three shell casings found at the rest area were cycled through Brentlinger's gun. Tr. 291, 372-373. When asked, Brentlinger stated that he did not have any evidence that would suggest that the three shell casings were not in fact cycled through his firearm. Tr. 458. The State also introduced several recordings. Ex. 14-20. In one of these recorded conversations, Brentlinger stated to Croft,

> **What happened the other night, my friend, was an act of God that you didn't wind up dead on the side of the highway. Okay? That was God saving your life from me killing you. Okay? The first thing you need to do is get on your knees and thank Jesus because you're still alive. That was Him that saved your life not me * * *.**

Ex. 16. Brentlinger was also recorded as saying, "If you didn't follow me, it wouldn't have happened * * *. You need to be thankful you're alive." Ex. 17. Similarly, when Detective Baker asked Brentlinger what happened on the night of January 5, 2015, Brentlinger was recorded answering that "[Croft] was advised that following me was a bad idea." Ex. 14.

{¶41} After considering the evidence on the basis of its weight and credibility, we do not find that the scales moved manifestly against a finding of guilty. On review of the record, we find that the jury could have reasonably

concluded from the evidence presented at trial that Brentlinger restrained or removed Croft for one of the prohibited purposes specified in R.C. 2905.01(A). Further, we do not see any indication that the jury lost its way and returned a verdict against the manifest weight of the evidence. For these reasons, Brentlinger's second assignment of error is overruled.

*Third Assignment of Error*

{¶42} In his third assignment of error, Brentlinger argues that the trial court erred in admitting prejudicial hearsay. He points to a portion of Pearson's trial testimony in which she stated what Lynette Brentlinger told her. These statements read as follows:

> **John [Brentlinger] * * * was mailing a gun back to their house that he had used in a crime in Ohio, that he had assaulted a man with it and shot at the man, shot the phone the man had with the gun, and that he had thought at the time the cops had the shell casings and so he was mailing the gun back to her to hide and she did not want any part of it. She did not want the gun delivered to her house because she was scared for her and her children.**

Tr. 214. The trial court admitted these statements as nonhearsay since they were not admitted for the stated purpose of proving the truth of the matter asserted but to explain the subsequent actions of the witness. However, Brentlinger claims that these statements were largely irrelevant for the stated purpose of explaining Pearson's subsequent conduct and highly relevant for the purpose of

demonstrating his guilt or innocence. Brentlinger claims that the prejudicial nature of these statements requires that his convictions be reversed. We disagree.

**{¶43}** This analysis requires us to perform two steps. First, we will determine whether these statements were properly admitted under the rules of evidence as nonhearsay. If Pearson's trial testimony does, in fact, contain hearsay statements, we will consider whether these statements had a prejudicial impact on the trial. Second, we will then determine whether admission of these statements violated Brentlinger's rights as guaranteed under the Confrontation Clause of the United States Constitution.

Hearsay Standard of Review

**{¶44}** "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). "A statement is not hearsay when offered for a purpose other than to prove the truth of the matter asserted." *State v. Osie*, 140 Ohio St.3d 131, 2014-Ohio-2966, 16 N.E.3d 588, ¶ 118, citing *State v. Davis*, 62 Ohio St.3d 326, 343, 581 N.E.2d 1362 (1991). Testimony is nonhearsay "when introduced to show its effect on the listener." *Osie* at ¶ 122. "It is well established that extrajudicial statements made by an out-of-court declarant are properly admissible to explain the actions of a witness to whom the statement was directed." *State v. Wendel*, 3d Dist. Union No. 14-16-08, 2016-Ohio-7915, ¶ 10,

quoting *State v. Thomas*, 61 Ohio St.2d 223, 232, 400 N.E.2d 401 (1980). *See State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 59. Generally, "[t]estimony offered to explain the investigative activities of witnesses * * * is admissible." *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 98, quoting *Thomas* at 232.

**{¶45}** However, "the well-worn phrase 'not offered for the truth of the matter asserted' is not a talismanic incantation that opens the door to everything said outside the courtroom." *State v. Ricks*, 136 Ohio St.3d 356, 2013-Ohio-3712, 995 N.E.2d 1181, ¶ 25, quoting *State v. Richcreek*, 196 Ohio App.3d 505, 2011-Ohio-4686, 964 N.E.2d 442 (6th Dist.). "Despite a professed nonhearsay use, if the statement's content could also cut toward proof of guilt, the potential for abuse is great." *Richcreek* at ¶ 24, citing *State v. Blanton*, 184 Ohio App.3d 611, 2009-Ohio-5334, 921 N.E.2d 1103, ¶ 38–39, and *State v. Blevins*, 36 Ohio App.3d 147, 149–150, 521 N.E.2d 1105 (1987). *See Ricks* at ¶ 26. However, if the testimony goes beyond what is necessary to explain the subsequent conduct of the witness, the testimony may become "more prejudicial than probative * * *." *Ricks* at ¶ 26. In these situations, "the jury is more likely to rely on the testimony to prove the matter asserted, which tilts the particular testimony into hearsay." *Id*.

**{¶46}** "[T]he admissibility of relevant evidence rests within the sound discretion of the trial court." *State v. Rollison*, 3d Dist. Marion 9-09-51, 2010-

Ohio-2162, ¶ 32, citing *City of Columbus v. Taylor*, 39 Ohio St.3d 162, 164, 529 N.E.2d 1382 (1988). In the absence of an abuse of discretion and a showing of material prejudice, "an appellate court will not disturb a trial court's ruling as to the admissibility of evidence." *Id.*, citing *State v. Martin*, 19 Ohio St.3d 122, 129, 483 N.E.2d 1157 (1985). *See Wendel* at ¶ 5; *State v. McKelton*, 148 Ohio St.3d. 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 97. "An abuse of discretion has been described as an unreasonable, arbitrary or unconscionable decision." *State v. Harris*, 3d Dist. Hancock No. 5-99-14, 1999 WL 797159 (Sept. 30, 1999).

Hearsay Analysis

**{¶47}** In this case, the trial court admitted Lynette's out-of-court statements to allow Pearson to explain her actions and not for the truth of the matter asserted. When Lynette asked Pearson to intercept a package coming to her house, Pearson needed more information in order to undertake this requested course of action. The fact that Brentlinger told Lynette that he "was mailing a gun back to their house that he had used in a crime in Ohio" was necessary information for Pearson to have if she was going to intercept these two packages. Tr. 213. The statements that Lynette disclosed to Pearson also became a basis of the subsequent investigation into the contents of these packages. Tr. 214. If the jurors were not given this information, Pearson's conduct and the resulting investigation may seem intrusive or illegitimate. Further, after defense counsel objected to these

statements as hearsay, the prosecution explained that these statements were not being offered for the truth of the matter asserted, prompting the court to issue a limiting instruction to the jurors that explained the purpose of these statements. Tr. 213.

**{¶48}** While the first sentence of the challenged statement was unquestionably necessary to understand Pearson's subsequent conduct, Pearson's further statements connecting Brentlinger to specific crimes committed in Ohio may have gone beyond what was absolutely necessary to explain her actions to the jury and provide a foundation for the resulting investigation. Even if this is the case, however, any error in admitting Lynette's out-of-court statements in this case was harmless. "[T]he accused has a constitutional guarantee to a trial free from prejudicial error, not one necessarily one free of all error." *State v. Gill*, 8th Dist. Cuyahoga No. 62323, 1993 WL 135829 (April 29, 1993), quoting *State v. Brown*, 65 Ohio St.3d 483, 485, 605 N.E.2d 46 (1992).

> **Under Evid.R. 103(A) and Crim.R. 52(A), we disregard as harmless the admission of improper hearsay evidence unless a substantial right of the party is affected. "Substantial rights are not affected 'where the remaining evidence constitutes overwhelming proof of a defendant's guilt * * *.'"**

*State v. Missler*, 3d Dist. Hardin No. 6-14-06, 2015-Ohio-1076, ¶ 60 (citations omitted).

{¶49} In this case, the challenged statements comprise two sentences stated in the course of a trial that lasted for four days. Doc. 232. *See Blevins*, *supra*, at 149-150. Here, the record contains other compelling evidence that supports these convictions, including Brentlinger's statements on the stand and in multiple recorded conversations. His own statements admit various elements of the offenses with which he was charged, verify portions of Croft's story, and corroborate much of the content of Lynette's out-of-court statements. Tr. 448, 451, 458, 469, 483, 495. Ex. 15-19. Further, "[t]here is no indication that the prosecution 'planted' this testimony or attempted to capitalize on it. It is more likely * * * [that the witness] 'blurted out' what [she] considered to be the reasons for [the] investigation." *Gill* at 3.

Confrontation Clause Standard of Review

{¶50} We now determine whether these statements were admitted in violation of the Confrontation Clause. The United States Constitution

> **guarantees the right of defendants in criminal cases "to be confronted with the witnesses against him." *Crawford* at 38. Since a witness is a person who "bear[s] testimony," *Id*. at 51, quoting 2 N. Webster, An American Dictionary of the English Language (1828), "the Confrontation Clause applies only to testimonial statements." *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, ¶ 59, citing *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, ¶ 15.**

*State v. Little*, 3d Dist. Allen No. 1-16-29, 2016-Ohio-8398, ¶ 17.

**{¶51}** "'Testimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Crawford v. Washington*, 541 U.S. 36, 51, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), quoting 2 N. Webster, An American Dictionary of the English Language (1828). "[I]f [a witness's] testimony regarding [an out-of-court declarant's] statements [were] not offered to prove the truth of the matter asserted, then it did not violate [the defendant's] right to confront witnesses." *Ricks* at ¶ 18. *See Crawford* at 59, fn. 9, citing *Tennessee v. Street*, 471 U.S. 409, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985).[8] "[W]e review de novo evidentiary rulings that implicate the Confrontation Clause." *McKelton, supra*, at ¶ 97, citing *United States v. Henderson*, 626 F.3d 326, 333 (6th Cir.2010).

Confrontation Clause Analysis

**{¶52}** In this case, Lynette's out-of-court statements were not, according to the prosecution, "offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Since testimony is "a solemn declaration or affirmation made for the purpose of establishing or proving some fact," the statements that were necessary to explain Pearson's subsequent conduct are, by definition, nontestimonial because their purpose was not to prove the truth of the matter asserted. *Crawford* at 51, quoting 2 N. Webster, An American Dictionary of the

---

[8] To support the preceding proposition from *Ricks*, the Supreme Court of Ohio quoted *Crawford*, which says, the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Ricks* at ¶ 18, quoting *Crawford* at ¶ 59, fn. 9.

English Language (1828). *See Davis v. Washington*, 547 U.S. 813, 823, 126 S.Ct 2266, 165 L.Ed.2d 224 (2006). Thus, the statements that were necessary to establish the reasons for Pearson's subsequent actions do not fall within the scope of the Confrontation Clause.

{¶53} As to the portion of Pearson's testimony which may have gone beyond what was necessary to explain Pearson's subsequent actions, the admission of these statements still does not implicate the Confrontation Clause. The Ohio Supreme Court has adopted the objective witness test to determine whether statements between people outside of law enforcement are testimonial. Under this test, testimonial statements are those

> made **"under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."** *Crawford*, **541 U.S. at 52, 124 S.Ct. 1354, 158 L.Ed.2d 177. In determining whether a statement is testimonial for Confrontation Clause purposes, courts should focus on the expectation of the declarant at the time of making the statement; the intent of a questioner is relevant only if it could affect a reasonable declarant's expectations.**

*State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, ¶ 36.

{¶54} Under this test, the out-of-court statements that Lynette made to Pearson are all nontestimonial. Since Pearson delivered mail to the Brentlingers' house, Lynette and Pearson were acquainted with one another. On hearing from her husband, Lynette did not contact the police or give a statement to law enforcement. Rather, she contacted a familiar acquaintance to help address a

specific problem. At the time of this conversation, it appears that her focus was on resolving the issues presented by having a gun used to commit a crime shipped to her house. We do not see any indication that her mind was contemplating the prospect of her statements being used in a criminal action. Further, according to Pearson, Lynette's expressed concern at the time of this conversation was the safety of her home and children. Tr. 214. Consequently, these statements did not violate Brentlinger's right to confrontation even if Pearson's statements gave more information than the circumstances of the trial necessitated. For these reasons, we overrule Brentlinger's third assignment of error.

*Fourth Assignment of Error*

**{¶55}** In his fourth assignment of error, Brentlinger contends that his conviction for tampering with evidence should be overturned for lack of venue. Since the conduct that provided the basis for this conviction occurred in Richland County and happened two days after the initial incident, which occurred at the rest area in Allen County, Brentlinger argues that the State was unable to establish that venue was proper by proving that an element of this crime was committed in Allen County. We are not persuaded by this argument. Contrary to Brentlinger's position, the primary issue here is not whether an element of the offense of tampering with evidence was committed in Allen County but whether Brentlinger

engaged in a course of criminal conduct under R.C. 2901.12(H) that connects the offenses committed across jurisdictional lines.

Standard of Review

{¶56} "Venue is not a material element of any crime but is a fact that must be proven beyond a reasonable doubt." *State v. Jalowiec*, 91 Ohio St.3d 220, 228, 744 N.E.2d 163 (2001) citing *State v. Headley*, 6 Ohio St.3d 475, 477, 453 N.E.2d 716 (1983). *See* Ohio Constitution, Article 1, Section 10 and R.C. 2901.12(A). R.C. 2901.12 states, in relevant part, the following:

> **(A) The trial of a criminal case in this state shall be held in a court having jurisdiction of the subject matter, and…in the territory of which the offense or any element of the offense was committed.**
>
> **\* \* \***
>
> **(H) When an offender, as part of a course of criminal conduct, commits offenses in different jurisdictions, the offender may be tried for all of those offenses in any jurisdiction in which one of those offenses or any element of one of those offenses occurred. Without limitation on the evidence that may be used to establish the course of criminal conduct, any of the following is prima-facie evidence of a course of criminal conduct:**
>
> **(1) The offenses involved the same victim, or victims of the same type or from the same group.**
>
> **(2) The offenses were committed by the offender in the offender's same employment, or capacity, or relationship to another.**

**(3) The offenses were committed as part of the same transaction or chain of events, or in furtherance of the same purpose or objective.**

**(4) The offenses were committed in furtherance of the same conspiracy.**

**(5) The offenses involved the same or a similar modus operandi.**

**(6) The offenses were committed along the offender's line of travel in this state, regardless of the offender's point of origin or destination.**

R.C. 2901.12(A), (H). While the general rule of R.C. 2901.12(A) places venue in the territory in which an offense is committed, R.C. 2901.12(H) does allow defendants who engage in a course of criminal conduct in which offenses are committed in multiple jurisdictions to be tried for all of these offenses in any jurisdiction where one of these offenses or an element of one of these offenses was committed. R.C. 2901.12(A), (H). *State v. Jackson*, 141 Ohio St.3d 171, 2014-Ohio-3707, 23 N.E.3d 1023, ¶ 146; *State v. Walker*, 2d Dist. Montgomery No. 17678, 2000 WL 873222 (June 30, 2000); *State v. Beuke*, 38 Ohio St.3d 29, 42, 526 N.E.2d 274 (1988).

**{¶57}** "[I]t is not essential that the venue of the crime be proven in express terms, provided it be established by all the facts and circumstances in the case, beyond a reasonable doubt, that the crime was committed in the county and state as alleged in the indictment * * *." *State v. Hampton*, 134 Ohio St.3d 447, 451, 2012-Ohio-5688, 983 N.E.2d 324 (2012), quoting *State v. Dickerson*, 77 Ohio St.

34, 82 N.E. 969 (1907). On review, we must view the evidence in the light most favorable to the prosecution. *State v. Valdez*, 3d Dist. Marion No. 9-16-01, 2017-Ohio-241, ¶ 142, citing *Monroe*, *supra*, ¶ 42. In making this ruling, appellate courts must examine the record to determine whether a rational trier of fact could have found "that the facts and circumstances in evidence are sufficient to demonstrate venue * * *." *Beuke* at 42; *Jaloweic* at 228, citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.E.2d 560, 573 and *Jenks*, supra, at paragraph two of the syllabus.

Legal Analysis

{¶58} Here, we find that Brentlinger engaged in a course of criminal conduct as at least two of the prima facie indicators that are listed in R.C. 2901.12(H) are present in this case. First, Brentlinger's actions form a "chain of events" under R.C. 2901.12(H)(3). The crime of tampering with evidence is necessarily connected to allegations of previous misconduct that are or are about to be the subject of an investigation. R.C. 2921.12(A)(1). In this case, Brentlinger was notified by Detective Baker that an investigation into his actions on January 5, 2015, had begun. Tr. 280, 495. Ex. 14. In response, on January 7, 2015, Brentlinger mailed his handgun from Richland County to his home in Tennessee to serve, in his words, as a "diversion." Tr. 455. While he also could have been tried in Richland County for the crime of tampering with evidence, this crime was

only possible because of the offenses he had previously committed in Allen County, and it was committed for the purpose of hindering an ongoing investigation in Allen County into these offenses. Tr. 455. Thus, the offenses in Allen County "prompted the next offense" committed in Richland County, "forming a chain of events." *Walker* at 14. *See* R.C. 2901.12(H)(3).

{¶59} Second, these offenses occurred along a "line of travel in this state" under R.C. 2901.12(H)(6). Brentlinger was driving through the state of Ohio to conduct business in various locations, going from Lima, Ohio to Mansfield, Ohio. Tr. 429. The jury found that Brentlinger committed several offenses in Lima, Ohio, making Allen County the source of the evidence of these crimes. Tr. 640-644. Brentlinger's trip across Ohio brought the evidence of these offenses out of Allen County and transported them into Richland County, where he shipped his handgun to his home address in Tennessee. Tr. 454. All of the offenses he was charged with were committed at points along this "line of travel in this state," uniting these offenses into a course of criminal conduct. R.C. 2901.12(H)(6). Since the record shows that Brentlinger engaged in a course of criminal conduct, we find that the State presented evidence sufficient for a reasonable trier of fact to determine that venue was proper in Allen County. For these reasons, Brentlinger's fourth assignment of error is overruled.

**{¶60}** Having found no error prejudicial to the appellant in the particulars assigned and argued, the judgment of the Allen County Court of Common Pleas is affirmed.

*Judgment Affirmed*

**PRESTON, P.J. and SHAW, J., concur.**

**/hls**