**[Cite as *State v. Richey*, 2021-Ohio-1461.]**

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## PUTNAM COUNTY

STATE OF OHIO,

                                          **CASE NO. 12-20-07**

    PLAINTIFF-APPELLEE,

    v.

KENNETH RICHEY,                            **O P I N I O N**

    DEFENDANT-APPELLANT.

---

**Appeal from Putnam County Common Pleas Court**
**Trial Court No. 2020 CR 40**

**Judgment Affirmed**

**Date of Decision:  April 26, 2021**

---

**APPEARANCES:**

    *Todd W. Barstow* **for Appellant**

    *Micah R. Ault* **for Appellee**

Case No. 12-20-07

**WILLAMOWSKI, P.J.**

{¶1} Defendant-appellant Kenneth T. Richey ("Richey") appeals the judgment of the Putnam County Court of Common Pleas, arguing (1) that his convictions for retaliation are not supported by sufficient evidence and are against the manifest weight of the evidence; and (2) that the trial court erred in admitting other acts evidence pursuant to Evid.R. 404(B). For the reasons set forth below, the judgment of the trial court is affirmed.

*Facts and Procedural History*

{¶2} Randall Basinger ("Basinger") worked as an assistant prosecutor in Putnam County in between 1981 and 1987. Tr. 312. In 1986, Basinger became the lead prosecutor in a case that resulted in Richey being charged with several crimes, including aggravated murder and aggravated arson. Tr. 316. Roy Sargent ("Sargent"), who is retired from the Putnam County Sheriff's Office, testified that Richey, while in jail awaiting trial in 1986, promised to get revenge on those who testified against him and on Basinger. Tr. 279-280. Sargent also testified that, at this time, Richey "was mad at everybody involved in the case * * *." Tr. 285.

{¶3} During this timeframe, law enforcement also intercepted a letter ("the 1986 Letter") that Richey had written to a friend that appeared to contain a coded message. Tr. 280-281. Ex. 11. The 1986 Letter contained the following statement:

**EVHA OSMOENE HOW ASH Ptacedec OT KEMA A THI NO SAGEBRIN HTE D.A. SONO THE SUPSU LIWL TEG HATWS GOCMIN OT MHI YMA EH TOR NI LELH!**

-2-

Ex. 11. When these letters are rearranged, this statement reads as follows: "Have someone who has accepted to make a hit on Basinger the D.A. Soon the p***y will get whats coming to him. May he rot in h**l!" Ex. 11. Basinger testified that, after he was notified of these threats, he took security precautions at his home. Tr. 319.

{¶4} In 1987, a three-judge panel found Richey guilty of aggravated murder and aggravated arson. Ex. 6. Tr. 317. The judges then determined to sentence Richey to death. Tr. 198-199. Ex. 6-7. However, Richey's death sentence was later overturned. Tr. 198. Pursuant to a plea agreement, Richey was released from prison on January 7, 2008. Ex. 7. Tr. 198, 341.

{¶5} By this point in time, Basinger had become a judge in Putnam County. Tr. 313. On December 31, 2011, Richey called Basinger's office and left the following message on the answering machine: "Hey Randall Basinger. I'm in Ohio. I'm coming to get you, b***h." Ex. 8. Tr. 320-321. In response to hearing this message, Basinger again took various security precautions. Tr. 321. Further, a police investigation was opened into Richey after this message was discovered. Tr. 284.

{¶6} Law enforcement determined that Richey was, at that time, living in Tupelo, Mississippi. Tr. 321. In early 2012, Sergeant Bethany K. Smith ("Sergeant Smith"), who works for the Tupelo Police Department, was notified of the message that Richey had left on the answering machine. Tr. 233, 235. On January 23, 2012,

Sergeant Smith sat down for an interview with Richey. Tr. 248. She then forwarded a copy of this interview to the investigators in Ohio. Tr. 236.

{¶7} On September 23, 2019, Lieutenant Josh Strick ("Lieutenant Strick") was dispatched to the house of Richey's cousin, Vicky Emry ("Emry"), to investigate a report that Richey had posted a threat online. Tr. 169. Once at the house, Emry showed Lieutenant Strick a Facebook Live video that Richey had posted at around 5:05 P.M. that afternoon. Tr. 170. Lieutenant Strick recorded a portion of this video on his body camera. Tr. 173. In this video, Richey stated the following:

> **[Richey]: Who the f\*\*\* cares?**
>
> **[Other voice]: And we're survivors too. We survive.**
>
> **[Richey]: And we do. But tonight's my last night. Because I can't survive any more.**
>
> **[Other voice]: Yeah.**
>
> **[Richey:] I've lost everything several times. Actually, no. Tonight's not my last night. Tonight is definitely not my last night. No. Somebody's going to die before me tonight. The motherf\*\*\*er who took my God damn life. He's gonna die before I do. And all his family.**
>
> **[Other voice]: No. Not all his family.**
>
> **[Richey]: No. All his family. Because he prevented me from havin' a family. So, he's gonna die. So's his kids and his grandkids and his great-grandkids.**
>
> **[Other voice]: Don't kill him instantly. Make him suffer.**

**[Richey]: He's gonna suffer.**

**\* \* \***

**[Richey]: He's gonna suffer so much he won't even f\*\*\*in' imagine it.**

**\* \* \***

**[Richey]: Blood for blood. Life for life.**

Ex. 2. Lieutenant Strick then went to Basinger's house to inform him of the video. Tr. 179. Basinger then contacted his family members to inform them of the content of this video. Tr. 179. The police also provided security to Basinger as a precautionary measure. Tr. 180.

{¶8} Around this time, Richey's ex-wife, Karen Charves ("Charves"), was told by a friend that Richey had been posting videos on Facebook. Tr. 300. But at this time, Charves was not Facebook friends with Richey. Tr. 302. For this reason, Charves, with her friend's permission, used her friend's Facebook account to view these videos. Tr. 302-303. Charves later testified that Richey had posted sixty videos on Facebook but that ten of them had been deleted. Tr. 300. Charves sent these videos to the police. Tr. 303.

{¶9} After examining these videos, Lieutenant Strick found three of them to be relevant to his investigation into Richey. Tr. 18-189. These three videos had been posted on June 8, 2019; June 9, 2019; and June 14, 2019. Tr. 189. In the video posted on June 8, 2019, Richey stated the following:

> **So why are you f\*\*\*ing interested in me?  Why?  Cause I spent twenty-years on death row.  Who gives a f\*\*\*?  S\*\*t happens.  The motherf\*\*\*ers who are responsible for it will pay.  Leave it at that.  Leave it at that.  Oh, I'm coming.  You won't know when, but I will.  Your daughters, your grandkids.  I don't give a f\*\*k.  I'm gonna get you.  Your legacy ends.**

Ex. 1A.  Tr. 188-189.  In the June 9, 2019 video, Richey said the following:

> **Old b\*\*\*\*\*d.  Fifty-four years old.  Lost too many—too many years.  That b\*\*\*h owes me.  But I'm comin' to get it.  Look at my f\*\*\*in' eyes.  Am I jokin'?  I'll be seein' you.  And you know who the f\*\*\* you are.  Payback's a b\*\*\*h.  Your kids.  Your grandkids.  Your whole family.  Life's a motherf\*\*\*er ain't it.  Especially when you piss someone off like me.  B\*\*\*h.**

Ex. 1A.  Tr.  Finally, in the June 14, 2019 video, Richey stated the following: "I know what I need to do.  Kill the b\*\*\*\*\*d who destroyed my life.  Yeah.  And his entire family."  Ex. 1A.

{¶10} On May 13, 2020, Richey was indicted on twelve counts of retaliation in violation of R.C. 2921.05(A), felonies of the third degree;[1] four counts of violating a protection order in violation of R.C. 2919.27(A)(2), felonies of the third degree; and one count of tampering with evidence in violation of R.C. 2921.12(A)(1), a felony of the third degree.  Doc. 1.

{¶11} On May 27, 2020, the State filed a motion that sought a preliminary ruling on the admission of other acts evidence at trial.  Doc. 12.  In this motion, the

---

[1] The State alleged that Richey issued threats directed at Basinger, Basinger's children, and Basinger's grandchildren in each of the Facebook Live videos that he recorded and posted on June 8, 2019; June 9, 2019; June 14, 2019; and September 23, 2019.  Doc. 1.  For this reason, the State indicted Richey on three counts of retaliation for each video.  Doc. 1.  However, at the end of Richey's trial, the trial court dismissed the eight counts of retaliation that arose from the threats that Richey had allegedly directed at Basinger's children and Basinger's grandchildren.  Tr. 370.

State noted that the crime of retaliation requires the prosecution to establish that the defendant "retaliate[d] against a public servant * * * who was involved in a * * * criminal action or proceeding." Doc. 12, quoting R.C. 2921.05(A). The State argued that, to prove the crime of retaliation, it would have to introduce evidence of a prior criminal action or proceeding. Doc. 12. The State also argued that other acts evidence was necessary to establish who Richey was threatening in his Facebook videos since Richey does not mention the subject of his threats by name. Doc. 12. On July 13, 2020, the trial court issued a preliminary decision that granted the State's request to use other acts evidence. Doc. 33.

{¶12} Richey's jury trial was held on July 20-21, 2020. Doc. 80. Before presenting its case, the State dismissed the four counts of violating a protection order in violation of R.C. 2919.27(A)(2). Tr. 136-137.

{¶13} During the State's case-in-chief, the trial court permitted the State to introduce other acts evidence over the Defense's continuing objection. Tr. 131, 192, 244, 264, 278, 298, 315, 353, 356. After the Defense rested, the trial court dismissed eight of the twelve counts of retaliation against Richey. Tr. 370. The trial court also dismissed the count of tampering with evidence for lack of venue. Tr. 381. The jury found Richey guilty of the remaining four counts of retaliation in violation of R.C. 2921.05(A). Doc. 53-56.

{¶14} On August 14, 2020, the trial court held Richey's sentencing hearing and issued its judgment entry of sentencing. Doc. 65. Richey filed his notice of

appeal on September 11, 2020. Doc. 72. On appeal, he raises the following two assignments of error:

**First Assignment of Error**

**The trial court erred and deprived Appellant of due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and Article One Section Ten of the Ohio Constitution by finding him guilty of retaliation, as that verdict was not supported by sufficient evidence and was also against the manifest weight of the evidence.**

**Second Assignment of Error**

**The trial court erred to the prejudice of the appellant by allowing the State to introduce prejudicial and irrelevant prior acts evidence.**

*First Assignment of Error*

{¶15} Richey argues that his convictions for retaliation are not supported by sufficient evidence and are against the manifest weight of the evidence.

Legal Standard: Sufficiency of the Evidence

{¶16} "A challenge to the sufficiency of the evidence supporting a conviction requires a court to determine whether the state has met its burden of production at trial." *In re Swift*, 8th Dist. Cuyahoga No. 79610, 2002-Ohio-1276, ¶ 19, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). This "analysis addresses the question of whether adequate evidence was produced for the case to be considered by the trier of fact and, thus, whether the evidence was 'legally sufficient to support the verdict * * *.'" *State v. Barga*, 3d Dist. Shelby No. 17-17-

14, 2018-Ohio-2804, ¶ 8, quoting *State v. Worthington*, 3d Dist. Hardin No. 6-15-04, 2016-Ohio-530, ¶ 12.

{¶17} An appellate court is not to examine whether the evidence presented should be believed but should rather "examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Johnston*, 3d Dist. Logan No. 8-13-10, 2014-Ohio-353, ¶ 10, quoting *State v. Jenks*, 61 Ohio St.3d 259, 274, 574 N.E.2d 492 (1991), *superseded by state constitutional amendment on other grounds in State v. Smith*, 80 Ohio St.3d 89, 684 N.E.2d 668 (1997). On appeal, the applicable standard

> **is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt.**

*State v. Brown*, 3d Dist. Hancock No. 5-17-19, 2018-Ohio-899, ¶ 27, quoting *State v. Plott*, 2017-Ohio-38, 80 N.E.3d 1108, ¶ 62 (3d Dist.).

{¶18} In this case, to prove the offense of retaliation in violation of R.C. 2921.05(A), the State had to establish that the defendant "purposely and * * * by unlawful threat of harm to any person * * * retaliate[d] against a public servant * * * who was involved in a civil or criminal action or proceeding because the public servant * * * discharged the duties of the public servant * * *." R.C. 2921.05(A).

{¶19} "The retaliation statute does not require that any threat of harm be communicated directly to the person threatened by the person doing the threatening." *State v. Farthing*, 146 Ohio App.3d 720, 2001-Ohio-7077, 767 N.E.2d 1242, ¶ 16 (2d Dist.). *See State v. Kunzer*, 3d Dist. Crawford No. 3-18-16, 2019-Ohio-2959, ¶ 42 (upholding a retaliation conviction where the defendant made a threatening statement "to a person who was likely to communicate this unlawful threat of harm to others").

> **Rather, "where 'the defendant was either aware that the threats would be communicated to the intended victim by the third person or could reasonably have expected the threats to be so conveyed,' he is guilty of the type of unlawful threat of harm required by the retaliation statute."**

*State v. Welch*, 6th Dist. Wood No. WD-07-057, 2008-Ohio-6540, ¶ 24, quoting *Farthing* at ¶ 16, quoting *State v. Lambert*, 2d Dist. Montgomery No. 16667, 1998 WL 288957, *4 (June 5, 1998).

Legal Analysis: Sufficiency of the Evidence

{¶20} Richey argues that his convictions are not supported by sufficient evidence because the State failed to establish that he "could reasonably have expected the threats" to be communicated to Basinger. *Lambert* at *4. Since Richey does not challenge the other elements of his convictions, we will limit our sufficiency-of-the-evidence analysis to consideration of this particular issue.

{¶21} At trial, the State introduced four video recordings of Richey from June 8, 2019; June 9, 2019; June 14, 2019; and September 23, 2019. Ex. 1A, 2. In

each of these videos, Richey can be seen and heard making multiple threats. Ex. 1A, 2. At trial, the testimony of Lieutenant Strick and Charves indicated that Richey had used Facebook Live to record these four videos. Tr. 170, 300. In his testimony, Lieutenant Strick explained that Facebook Live enables users to stream or broadcast a video online in real time. Tr. 170. He also explained that other users can view this livestream. Tr. 170.

{¶22} Further, the evidence produced at trial also indicated that Richey left these video recordings posted online after he had finished the livestream. Lieutenant Strick testified that he viewed the September 23, 2019 video on a computer at Emry's house one hour after Richey had begun to broadcast the video on Facebook Live. Tr. 176. Similarly, Charves indicated that she accessed these videos online after Richey had posted them on his Facebook page.[2] Tr. 300-302. At trial, Charves confirmed that she was not Facebook friends with Richey at the time she saw the videos he had posted. Tr. 300-302. However, Charves had a friend who was connected to Richey on Facebook. Tr. 303. Charves accessed these videos through her friend's Facebook account. Tr. 302-303.

{¶23} While Richey did not communicate any of these threats directly to Basinger, Richey repeatedly posted videos of himself issuing these threats on his Facebook page. These threats were not issued anonymously but broadcasted on an

---

[2] Charves testified that there had been sixty videos online; that around fifty of them were still posted; and that ten of the videos had been deleted. Tr. 300. She testified that she forwarded the remaining videos to law enforcement. Tr. 300-302. Lieutenant Strick testified that he received forty-nine videos. Tr. 188.

online account that was associated with his name. Ex. 2. Further, he left recordings of these Facebook Live videos on his online account for some time after he posted them. Repeatedly broadcasting these videos online and leaving them posted on his Facebook page increased the likelihood that Basinger would become aware of the threats contained therein.

{¶24} Richey also points to two cases in support of his arguments in this assignment of error: *State v. Farthing*, *supra*, and *State v. Bragg*, Clermont C.P. No. 2018 CR 00930, 2019 WL 1503002 (Mar. 19, 2019). In *Farthing*, the defendant wrote a private letter to another inmate that contained threatening statements that were directed at his former parole officer. *Id*. at ¶ 4. The defendant was convicted of retaliation after this letter was discovered. *Id*. at ¶ 4-5. The Second District Court of Appeals reversed this conviction after determining that the defendant "had no reason to expect" that statements made in a private message would be communicated to his former parole officer. *Id*. at ¶ 17.

{¶25} *Farthing* is distinguishable from the case presently before this Court. Richey did not make threatening statements in a private communication. Instead, Richey broadcasted these statements online. Tr. 170. Further, by posting these videos online, Richey also made these recorded threats accessible to others after his livestream broadcasts had concluded. Tr. 170, 300. Richey also repeatedly recorded and posted threats online while the defendant in *Farthing* wrote one private letter. Ex. 1A, 2. *Farthing, supra*, at ¶ 17.

{¶26} In *Bragg*, the defendant was charged with telecommunications harassment after he made a statement on Facebook about an elected official. *Bragg* at *1. The defendant did not know this official personally; had never contacted this official before; was not Facebook friends with this official; did not directly message this official online; and did not tag this official in this post. *Id*. Based on these facts, the Clermont Court of Common Pleas determined that the evidence did not establish "that, at the moment the defendant posted on Facebook * * *, he did not have the specific intention to abuse, threaten, or harass" the state official, even though the defendant had posted this statement online. *Id*. at *4.

{¶27} *Bragg* is also distinguishable from the case before this Court. In contrast to the defendant in *Bragg*, Richey had personally interacted with Basinger in the past; had a complicated history with Basinger that spanned decades; had direct contact with Basinger in the past; and had posted these threats online multiple times. Tr. 315-317, Ex. 1A, 2. Importantly, we note that Richey was convicted of retaliation, not telecommunications harassment. *See Bragg, supra*, at *1.

{¶28} After reviewing the materials in the record, we conclude that the jury could find that Richey, by repeatedly broadcasting, recording, and posting threats online, "could reasonably have expected that these threats would be communicated" to Basinger. *Farthing, supra,* at ¶ 16. From the evidence produced by the State at trial, a rational trier of fact could have found that Richey was guilty of the four counts of retaliation in violation of R.C. 2921.05(A). Since the State produced some

evidence to substantiate each of the essential elements of these offenses, his four convictions for retaliation are supported by sufficient evidence. As such, this argument is without merit.

Legal Standard: Manifest Weight of the Evidence

{¶29} In a manifest weight analysis, "an appellate court determines whether the state has appropriately carried its burden of persuasion." *State v. Blanton*, 121 Ohio App.3d 162, 169, 699 N.E.2d 136 (3d Dist. 1997). "Unlike our review of the sufficiency of the evidence, an appellate court's function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict." *Plott, supra*, at ¶ 73. Thus, "the appellate court sits as a 'thirteenth juror' * * *." *State v. Davis*, 3d Dist. Seneca No. 13-16-30, 2017-Ohio-2916, ¶ 17, quoting *Thompkins, supra*, at 387. On appeal, courts

> **must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Brentlinger*, 2017-Ohio-2588, 90 N.E.3d 200, ¶ 36 (3d Dist.), quoting *Thompkins* at 387.**

*State v. Schatzinger*, 3d Dist. Wyandot No. 16-20-04, 2021-Ohio-167, ¶ 52.

{¶30} "A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses." *State v. Sullivan*, 2017-Ohio-8937, 102 N.E.3d 86, ¶ 38 (3d Dist.), quoting *State v. Coleman*, 3d Dist. Allen No. 1-13-53, 2014-Ohio-5320, ¶ 7. "Only

in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Little*, 2016-Ohio-8398, 78 N.E.3d 323, ¶ 27 (3d Dist.), quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 119.

Legal Analysis: Manifest Weight of the Evidence

**{¶31}** On cross-examination, Lieutenant Strick testified that, to his knowledge, Richey was not Facebook friends with Basinger. Tr. 218-219. He also stated that, to his knowledge, Basinger was not watching these livestreams in real time. Tr. 219. Lieutenant Strick testified that he could not determine how many people were watching the different livestreams at the time that Richey was issuing threats. Tr. 218. However, he stated that Richey noted that he had sixty to sixty-five viewers for one of the Facebook livestreams that he posted on June 14, 2019.[3] Tr. 193, 218.

**{¶32}** Lieutenant Strick also testified that Richey's cousin, Emry, was the person who saw the Facebook Live post and notified the authorities. Tr. 169. He confirmed that Emry was able to "provide [him] with the identity of the person she believed to be the victim" based on the content of the video. Tr. 178. He also stated that Richey posted "a lot" of footage through Facebook Live. Tr. 219. Lieutenant

---

[3] The Facebook Live video in which Richey noted the number of people watching his livestream was posted at 1:34 P.M. on June 14, 2019. Tr. 218. Later that day, Richey posted another Facebook Live video at 5:30 P.M. in which he issued threats. Tr. 218. *See* Ex. 1A. These were two different videos. Tr. 218. The video posted at 5:30 P.M. on June 14, 2019 became the basis of Richey's third conviction for retaliation in this case. Ex. 1A.

Strick stated that some of Richey's videos were "five hours long, many are two or three hours long." Tr. 219.

{¶33} Charves testified that, at the time of the relevant posts, she was not Facebook friends with Richey. Tr. 302. She stated that she became aware of these posts through a friend who was connected to Richey on Facebook. Tr. 302. Charves testified that Richey had posted around sixty Facebook Live videos on his account but had deleted roughly ten of these videos. Tr. 300. Further, on cross-examination, Basinger testified that he did not discover these videos online but was shown these videos by law enforcement. Tr. 344.

{¶34} Having reviewed the evidence presented at trial on the basis of its weight and credibility, we conclude that the evidence in the record does not weigh heavily against Richey's four convictions for retaliation. Further, there is no indication in the record that the jury lost its way and returned a verdict against the manifest weight of the evidence. As such, Richey's first assignment of error is overruled.

*Second Assignment of Error*

{¶35} Richey argues that the trial court erred by allowing evidence of his other acts to be admitted at trial.

Legal Standard

{¶36} "Evid.R. 404(B) categorically prohibits evidence of a defendant's other acts when its only value is to show that the defendant has the character or

-16-

propensity to commit a crime." *State v. Smith*, 2020-Ohio-4441, --- N.E.3d ---, ¶ 36, citing Evid.R. 404(B). In other words, "evidence which tends to show that the accused has committed other crimes or acts independent of the crime for which he stands trial is not admissible to prove a defendant's character or that the defendant acted in conformity therewith." *State v. Wendel*, 2016-Ohio-7915, 74 N.E.3d 806 (3d Dist.), quoting *State v. Hawthorne*, 7th Dist. Columbiana No. 04 CO 56, 2005-Ohio-6779, ¶ 24. *See* Evid.R. 404(A). However, under Evid.R. 404(B), "the admission of 'other acts' extrinsic to the charged offense * * *" is permissible in certain circumstances. *State v. Lester*, 3d Dist. Union Nos. 14-18-21, 14-18-22, 2020-Ohio-2988, ¶ 43. *See* R.C. 2945.59. *See* Evid.R. 404(B).

{¶37} In determining whether other acts evidence is admissible, the Ohio Supreme Court has set forth a three-step analysis. *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, ¶ 19-20.

> **'The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence.' [*Williams* at] ¶ 20, citing Evid.R. 401. *See also [State v.] Hartman[*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651,] ¶ 24, 28.**

*State v. Williams*, 3d Dist. Allen No. 1-19-70, 2021-Ohio-256, ¶ 16. "The threshold question is whether the evidence is relevant." *Smith* at ¶ 37. "The rule governing the admissibility of other-acts evidence does not bypass the relevancy determination." *Hartman* at ¶ 25. But

> **the problem with other-acts evidence is rarely that it is irrelevant; often, it is too relevant.** *Hartman* **at ¶ 25;** *see* **1A Wigmore, Evidence, Section 58.2, at 1212 (Tillers Rev. 1983). In the Evid.R. 404(B) context, the relevance examination asks whether the proffered evidence is relevant to the particular purpose for which it is offered, as well as whether it is relevant to an issue that is actually in dispute.** *Hartman* **at ¶ 26-27.**

*Smith* at ¶ 37. For this reason, "the inquiry is not whether the other-acts evidence is relevant to the ultimate determination of guilt. Rather, the court must evaluate whether the evidence is relevant to the particular purpose for which it is offered."

*Hartman, supra*, at ¶ 26; *Smith, supra*, at ¶ 37.

> **'The next step is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B).'**

*Williams*, 2021-Ohio-256, ¶ 16 (3d Dist.), quoting *Williams*, 2012-Ohio-5695, ¶ 19-20. Evid.R. 404(B) states that other acts evidence may be admissible to establish "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Evid.R. 404(B). "The key is that the [other acts] evidence must prove something other than the defendant's disposition to commit certain acts." *Smith, supra*, at ¶ 36, quoting *Hartman, supra*, at ¶ 22.

{¶38} These first two steps of the Ohio Supreme Court's analysis present questions of law and are subject to a de novo standard of review on appeal. *State v. McDaniel*, 2021-Ohio-724, --- N.E.3d ---, ¶ 17 (1st Dist.). *Hartman* at ¶ 22, citing Leonard, *The New Wigmore: Evidence of Other Misconduct and Similar Events*,

Section 4.10 (2d Ed.2019) ("[d]etermining whether the evidence is offered for an impermissible purpose does not involve the exercise of discretion * * *, an appellate court should scrutinize the [trial court's] finding under a de novo standard" of review).

{¶39} "The analysis does not end once a proponent has established a permissible nonpropensity purpose for the admission of other-acts evidence." *Hartman* at ¶ 29.

> **'The third step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice.' *Williams*[, 2012-Ohio-5695,] ¶ 20, citing Evid.R. 403. *See also Hartman* at ¶ 29.**

*Williams,* 2021-Ohio-256, at ¶ 16 (3d Dist.). "As the importance of the factual dispute for which the evidence is offered to the resolution of the case increases, the probative value of the evidence also increases and the risk of unfair prejudice decreases." *Hartman, supra*, at ¶ 31.

{¶40} This third step "constitutes a judgment call which we review for abuse of discretion." *McDaniel* at ¶ 17. *See Hartman, supra*, at ¶ 30 (holding that "[b]alancing the risks and benefits of the evidence necessarily involves an exercise of judgment; thus, the trial court's determination should be reviewed for an abuse of discretion").

> **An abuse of discretion is not merely an error of judgment. *State v. Sullivan*, 2017-Ohio-8937, [102 N.E.3d 86], ¶ 20 (3d Dist.). Rather, an abuse of discretion is present where the trial court's decision was arbitrary, unreasonable, or capricious. *State v.***

**Howton, 3d Dist. Allen No. 1-16-35, 2017-Ohio-4349, ¶ 23. When the abuse of discretion standard applies, an appellate court is not to substitute its judgment for that of the trial court. State v. Thompson, 2017-Ohio-792, 85 N.E.3d 1108, ¶ 11 (3d Dist.).**

*State v. Miller*, 3d Dist. Hancock No. 5-20-15, 2020-Ohio-5377, ¶ 11.

Legal Analysis

**{¶41}** In this case, the trial court permitted the State to introduce other acts evidence pursuant to Evid.R. 404(B). Under the first step of the applicable test, we are to determine whether the challenged other acts evidence is relevant. *Williams*, 2012-Ohio-5695, ¶ 20 (3d Dist.); *McDaniel, supra*, at ¶ 17. As an initial matter, we note that Richey has not argued on appeal that the other acts evidence introduced at trial was irrelevant. *See* Evid.R. 401, 402. Further, there is no indication in the record that any of this contested evidence fails to meet the basic relevancy requirements of Evid.R. 401. *See* Evid.R. 401.

**{¶42}** However, in *Hartman*, the Ohio Supreme Court shifted the emphasis of this analysis to encompass issues beyond the basic relevancy requirements of Evid.R. 401. *Hartman, supra*, at ¶ 24-25, citing Evid.R. 401, 402. The focus of this analysis is to examine whether the challenged other acts evidence was (1) "relevant to the particular purpose for which it [was] offered" and (2) "relevant to an issue that is actually in dispute." *State v. Sotelo*, 6th Dist. Lucas No. L-19-1240, 2020-Ohio-5368, ¶ 32, citing *Hartman, supra*, at ¶ 24-25.

{¶43} As a general matter, we note that the other acts evidence introduced at trial is less likely to be used as propensity evidence in this case because Richey can be seen and heard committing the alleged criminal acts in the four recordings he made of himself. Ex. 1A, 2. For example, the evidence that tends to establish that Richey issued threats in 1986 was not introduced to prove that Richey was likely to have issued threats in 2019 because the Facebook Live videos clearly establish that he did issue threats in 2019.

{¶44} Further, in these recordings, Richey alludes to the reasons that he was issuing threats through vague references to being on death row; losing years of his life; and losing the opportunity to have a family. Ex. 1A, 2. He also states that this threatened harm would be "payback" for some perceived wrong against him. Ex. 1A. But to prove a violation of R.C. 2921.05(A), the State could not merely establish that Richey was issuing threats as retaliation for any perceived wrong from his past. Rather, under the facts of this case, the State had to prove that Richey issued these threats to retaliate against a person for discharging his or her duties as a public servant in a prior criminal proceeding. *See* R.C. 2921.05(A). While these threats are clearly made in response to some perceived wrong, they are not, standing alone, sufficient to determine whether they are motivated by a purpose to retaliate against a public servant for being involved in a prior criminal proceeding.

{¶45} We also note that, in this case, Richey did not mention the name of the person who he perceived as wronging him and destroying his life in the video

recordings that he posted online. Ex. 1A, 2. For this reason, the content of the Facebook Live videos is not sufficient to determine the identity of the person who is threatened. Thus, motive and identity are material issues of fact at trial. The fact that the State was able to introduce video recordings of Richey committing the alleged criminal acts in this case suggests that the other acts evidence was introduced to establish *why* Richey issued these threats and *who* he was threatening instead of to show Richey's propensity to issue threats.

{¶46} We turn now to the second step wherein we will determine whether the different pieces of other acts evidence were presented for a legitimate purpose. *McDanial, supra*, at ¶ 17; *Williams*, 2021-Ohio-256, ¶ 16 (3d Dist.). *See* Evid.R. 404(B). At trial, the State presented other acts evidence at trial from the following periods of time: 1986, 2008, 2011-2012, and 2014. We will now analyze the other acts evidence from each of these periods of time:

{¶47} *1986 Trial, Letter, and Threats*: At trial in this matter, Lieutenant Strick and Basinger testified about the charges against Richey in 1986. Tr. 198-199. Lieutenant Strick testified that Richey was charged with aggravated arson and aggravated murder in 1986. Tr. 198. The State also introduced a certified copy of Richey's prior conviction for aggravated murder from 1987. Ex. 7. Lieutenant Strick stated that Richey was sentenced to death. Tr. 199. Basinger then testified that he became involved in this prior case against Richey in 1986 and was the lead prosecutor at Richey's trial in 1987. Tr. 315-316.

{¶48} Further, Michael Ball ("Ball"), who retired from the Putnam County Sheriff's Office, testified that he was working in the corrections division in 1986. Tr. 262-264. He stated the following about an interaction he had with Richey while he was incarcerated in August of 1986:

> **And there was a time when I walked up towards the area of where Kenneth Richey was, he had asked me if I could give him a message to Basinger, referred to him as Basinger. And he just said that, give him a message that when he got out he was going to cut his throat.**

Tr. 264. Ball also testified that, on another occasion, Richey stated that "Basinger was going to die." Tr. 266.

{¶49} At trial, Sargent testified that he was involved with the investigation into the charges against Richey in 1986 and that he spoke with Richey in October or November of 1986 while he was incarcerated. Tr. 277-278. Sargent then said the following:

> **And he [Richey] started to ask me a little bit about his case, and I told him that I really shouldn't talk to him right now without his attorney present; and he said he didn't care.**
>
> **And then about that time he started telling me, he said Basinger was dead.**
>
> **And I asked him why.**
>
> **And he said, he's ruined my family, ruined my life. He said, my dad won't come see me. I'm not allowed to call nobody. And, you know, and then he also talked about everybody else, that anybody testified against him or anything that they better hope he's 6 feet under because he'll get his revenge when he gets out.**

Tr. 279-280. Sargent also testified about the contents of the 1986 Letter that Richey had written to a friend. Tr. 282. The State then introduced a copy of the 1986 Letter into evidence. Ex. 11. Tr. 282, 356.

{¶50} As we have noted previously, the evidence regarding the murder investigation in 1986 and the subsequent trial in 1987 was necessary to establish the crime of retaliation. *See State v. Lambert*, 2d Dist. Montgomery No. 16667, 1998 WL 288957, *4 (June 5, 1998). In this case, the State had to establish that Richey's unlawful threats of harm were retaliation for Basinger having discharged his duties as a prosecuting attorney in a previous criminal proceeding. This evidence establishes (1) the existence of a prior criminal action or proceeding; (2) Basinger's involvement in that proceeding as a public servant; and (3) that Richey was angry at Basinger for discharging his duties in that criminal proceeding.

{¶51} We turn now to the 1986 Letter and the other threats Richey made in 1986. This evidence tends to establish Richey's motive. *See* Evid.R. 404(B). "Motive evidence establishes that the accused had a specific reason to commit a crime." *Hartman, supra*, at ¶ 48. In this case, the testimony about the 1986 Letter and the other threats that Richey made in 1986 established a connection between Richey's statements in 2019 and the prior criminal proceeding in which Basinger discharged his duties as a public servant. This other acts evidence tends to establish that Richey was motivated to issue threats of harm in 2019 as retaliation for

Basinger's involvement as a public servant in this prior criminal proceeding in 1986 and 1987.

**{¶52}** This other acts evidence also helps to establish the identity of the person that Richey is threatening through his modus operandi. *See* Evid.R. 404(B).

> **'Modus operandi' literally means method of working. *See People v. Barbour*, 106 Ill.App.3d 993, 999, 62 Ill.Dec. 641, 436 N.E.2d 667 (1982). It is evidence of signature, fingerprint-like characteristics unique enough 'to show that the crimes were committed by the same person.' Weissenberger, Federal Evidence, Section 404.17 (7th Ed.2019). Evidence of modus operandi is relevant to prove identity * * *.**

*Hartman, supra*, at ¶ 37.[4] "To be admissible to prove identity through a certain modus operandi, other-acts evidence must be related to and share common features with the crime in question." *State v. Lowe*, 69 Ohio St.3d 527, 634 N.E.2d 616, paragraph one of the syllabus (1994). At trial, Basinger testified at trial that the content of these earlier threats is what led him to believe, upon viewing the Facebook Live videos, that the threats issued by Richey were directed at him. Tr. 330. Basinger testified as follows:

> **The statements that he [Richey] again makes about taking his life, about wanting to kill me and my family, including my children and grandchildren, and that he repeats in similar fashion the same types of threats that he had made in the past.**

---

[4] We note that, in *Hartman*, modus operandi was examined in the context of determining the identity of the defendant whereas, in the case before this Court, the modus operandi evidence was introduced to establish the identity of the subject of Richey's threats. *Hartman, supra*, at ¶ 37.

Tr. 334-335. This other acts evidence tends to establish Richey's motive and the identity of the person he threatened. For these reasons, we conclude that this other acts evidence from this 1986-1987 timeframe was relevant to and admitted for legitimate purposes at trial.

{¶53} *2008 Sky News Interview*: Lieutenant Strick testified that, after Richey was released from prison in 2008, he sat down for an interview with Sky News and "discussed some of his feelings towards Mr. Basinger." Tr. 194, 196.[5] He further stated that, in this interview, Richey "states a threat on there of what he would like to do to Mr. Basinger." Tr. 195. Lieutenant Strick testified that this video was still posted on YouTube at the time of the trial. Tr. 226.

{¶54} Again, this evidence tends to establish the identity of the person threatened in the Facebook Live videos. At trial, defense counsel asked Sargent on cross-examination whether Richey was, in 1986, mad at others involved in his case besides Basinger. Tr. 286. Sargent stated that Richey "was mad at everybody involved in the case" at that time. Tr. 287. He also testified that Richey said "that anybody [who] testified against him or anything that they better hope he's 6 feet under because he'll get his revenge when he gets out." Tr. 280. In this line of questioning, the Defense was putting at issue the identity of the person who was being threatened in the 2019 Facebook Live videos.

---

[5] A copy of the video interview was not admitted into evidence. However, we can, from the trial testimony elicited on direct examination and cross-examination determine the purpose of the interview for the other acts evidence analysis.

**{¶55}** From the testimony at trial, the Sky News interview was introduced to establish that, by the time of his release in 2008, Richey was still angry at Basinger for his involvement in the 1986-1987 murder case against him (Richey) over twenty years after his trial had concluded. Further, the trial testimony indicates the general focus of Richey's statements during this interview was Basinger. This other acts evidence is probative of Richey's motive and Basinger's identity. Thus, we conclude that this other acts evidence from this 2008 interview was relevant to and admitted for legitimate purposes at trial.

**{¶56}** *2011 Answering Machine Message Investigation*: Basinger testified that, on December 31, 2011, Richey had left the following message on the answering machine at the court where Basinger worked: "Hey Randall Basinger. I'm in Ohio. I'm coming to get you, b***h." Ex. 8. Tr. 320-321. Basinger stated that he was, at that time, very concerned by this threat and took a number of security precautions in response. Tr. 320-321. At trial, the State introduced a recording of the message that Richey left on the answering machine. Tr. 201. Ex. 8.

**{¶57}** Sergeant Smith testified that she was involved in the investigation into this message in 2012. Tr. 233, 235. She sat down with Richey for an interview on January 23, 2012. Tr. 248. Sergeant Smith testified that Richey expressed a belief that "Basinger [had] it in for him * * *." Tr. 240. She testified further as follows:

> **He [Richey] stated that the fire had been initially ruled as accidental and he stated that basically Basinger had convinced or somehow had it ruled to arson instead of accidental.**

**\* \* \***

> **[H]e [Richey] stated that he didn't know why Basinger had it in for him, that he wish[ed] he knew.**

Tr. 242. She also confirmed that Richey had expressed a belief "that Basinger had set him up \* \* \*" and that Basinger had "unfairly treated" him during the murder trial in 1986. Tr. 241. At trial, the State played portions of a recording of the interview between Sergeant Smith and Richey. Tr. 243-244. Ex. 9.

{¶58} Further, Sargent testified that he was involved in the investigation into the answering machine message in 2012. Tr. 284. Regarding this investigation, Sargent stated that law enforcement "never received any complaints from any other witnesses that, you know, he had actually tried to contact them, threaten them, or anything like that. It was always Basinger." Tr. 285. Sargent also noted that Richey had asked if Basinger was married or had children. Tr. 285.

{¶59} Even though Richey had, in 1986, expressed a desire to get revenge against those who were willing to testify against him in his murder trial, Sargent's testimony indicates that, during the course of his investigation in 2012, he did not uncover any evidence that Richey was threatening another person who had been involved in the murder case in 1986 and 1987. Tr. 285. In his interview with Sergeant Smith, Richey provides a clear articulation of the reasons he is still angry at Basinger. Tr. 242. This evidence tends to establish that Richey had, by this point, specifically singled out Basinger as the person who had "set him up." Tr. 241. In

turn, this helps to establish both Richey's motive and Basinger's identity in the case currently before this Court.

**{¶60}** Further, the fact that Richey made this threat in 2011 and was subject to a criminal investigation afterwards is probative of his intent. Evid.R. 404(B). As to this issue, "[t]he question * * * is not whether the act occurred but whether the defendant acted with a criminal intent." *Hartman, supra*, at ¶ 53. In this case, the Defense, as evidenced by its closing arguments, put Richey's intent at issue, arguing that he did not intend to retaliate against Basinger but merely posted some videos online. Tr. 399, 401-401. *See Smith, supra*, at ¶ 45, 52. The evidence from the investigation into the 2011 answering machine message tends to establish that, when Richey was posting these videos on Facebook, he was aware of the seriousness of his conduct and the effect that these threats would have on their subject. For these reasons, we conclude that this other acts evidence from 2011-2012 was relevant to and admitted for legitimate purposes at trial.

**{¶61}** *2014 Thanksgiving Comments*: At trial, Charves testified that she married Richey in 2014. Tr. 295. She stated that, at Thanksgiving in 2014, Richey played a video of his interviews on the internet. Tr. 298. She stated that Richey told them that Basinger "was the man that destroyed his life" and that Basinger "had him [Richey] put away for 21-and-a-half years for a crime he [Richey] * * * didn't commit." Tr. 299. She testified that Richey would make these kinds of comments "off and on depending on how much alcohol he consumed." Tr. 299. She then

stated that Basinger was the only person that Richey had ever identified as the person who destroyed his life. Tr. 301. She testified that Richey never referred to anyone else as the person who destroyed his life. Tr. 301.

{¶62} Again, this evidence tends to establish the identity of the person who Richey was threatening in 2019. In the Facebook Live videos, Richey describes this unnamed object of his threats as the person "who destroyed my life." Ex. 1A. As he issues threats, he also states that he "spent twenty-years on death row" and that he "[l]ost too many * * * years." Ex. 1A. Charves testimony not only tends to establish that Richey was threatening Basinger but also tends to establish that Richey was not threatening someone else. Tr. 300-302. Having examined this evidence, we conclude that this other acts evidence from 2014 was relevant to and admitted for legitimate purposes at trial.

{¶63} We turn now to the third step of this analysis wherein we examine whether the danger of unfair prejudice substantially outweighs the probative value of this other acts evidence. *Williams*, 2021-Ohio-256, at ¶ 16 (3d Dist.). In this case, the trial court "t[ook] steps to minimize the danger of unfair prejudice inherent in the use of such evidence and to ensure that the evidence is considered only for a proper purpose." *Hartman, supra*, at ¶ 34. The trial court gave the jury the following instruction regarding this other acts evidence:

> **Now, I have permitted evidence to be admitted regarding past activities that the defendant engaged in regarding the actions or words regarding Mr. Basinger. These prior acts were admitted**

**for the sole purpose of proving his purpose, intent, motive, and/or design in this case. You may not consider this evidence for any other purpose, like you cannot consider the evidence that because he did something bad in the past means he did something bad in 2019 regarding the subject of this indictment.**

Tr. 431. The Ohio Supreme Court has held that "an appropriate jury instruction geared toward the specific purpose for which the evidence has been admitted will help reduce the risk of confusion and unfair prejudice." *Hartman, supra*, at ¶ 34. Further, we are to "presume that the jurors followed the trial court's instructions." *State v. Baker*, 3d Dist. Allen No. 1-17-61, 2018-Ohio-3431, ¶ 21.

{¶64} We also note that the trial court did take steps to limit the potential for any unfair prejudice that might arise from the incident surrounding the answering machine message that Richey left at Basinger's office in 2011. Before Richey's trial, the judge informed the parties that "the fact that he [Richey] was convicted of * * * [retaliation in 2011] and sentenced on that[,] I'm not going to allow that [to be admitted into evidence]." Tr. 129. Thus, the trial court took steps to limit the potential for unfair prejudice that could arise from having evidence of Richey's prior conviction for retaliation admitted at trial. This reduces the potential for the jury to use the other acts evidence as propensity evidence.

{¶65} Further, as we have already noted, Richey can be seen and heard issuing threatening statements in four videos that he recorded of himself and then posted online. Ex. 1A, 2. For this reason, much of the other acts evidence was introduced to establish the identity of the victim of this offense not the identity of

the perpetrator of this offense. These facts significantly reduce the risk of jury confusion over the other acts evidence. The jurors were likely to rely on the videos from 2019 to determine whether Richey had issued unlawful threats of harm in 2019. In this case, they were not likely to impermissibly or misguidedly rely on Richey's past threats from 1986-1987, 2008, 2011-2012, and 2014 to come to the conclusion that Richey had issued unlawful threats in 2019.

{¶66} Having reviewed the materials in the record, we conclude that the trial court did not err or abuse its discretion in permitting the State to introduce this other acts evidence at trial. This other acts evidence was relevant to and admitted for legitimate purposes under Evid.R. 404(B). Further, there is no indication in the record that the danger of unfair prejudice substantially outweighed the probative value of this other acts evidence. For this reason, Richey's second assignment of error is overruled.

*Conclusion*

{¶67} Having found no error prejudicial to the appellant in the particulars assigned and argued, the judgment of the Putnam County Court of Common Pleas is affirmed.

***Judgment Affirmed***

**ZIMMERMAN and MILLER, J.J., concur.**

**/hls**